**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SACE S.P.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1042 (KBJ) |
| | ) | |
| THE REPUBLIC OF PARAGUAY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff SACE S.p.A. ("SACE") is an Italian joint stock corporation that has brought the instant action seeking to enforce two foreign money judgments against Defendant Republic of Paraguay ("Paraguay"). SACE claims that it holds all rights to two Swiss money judgments that are "enforceable against Paraguay under the laws of Switzerland[,]" (Compl., ECF No. 1, ¶¶ 12, 16); it has filed the instant action pursuant to the District of Columbia's Uniform Foreign-Country Money Judgment Recognition Act of 2011, ("the D.C. Recognition Act"), D.C. Code §§ 15-361–71, seeking a court order that enters judgment against Paraguay for the U.S.-dollar equivalent of the amount of the Swiss awards, along with specified categories of interest. (*See* Compl., Relief Requested ¶ B.) Significantly for present purposes, SACE's complaint maintains that this Court has subject matter jurisdiction to entertain this enforcement action as provided under the Foreign Sovereign Immunities Act ("FSIA" or "the Act"), 28 U.S.C. §§ 1602–11, because Paraguay (a foreign state defendant) waived its sovereign immunity with respect to the loan transactions upon which the Swiss money judgments

are based.  (*See* Compl. ¶ 1.)  *See also* 28 U.S.C. § 1605(a)(1) (authorizing jurisdiction over a foreign state in a case "in which the foreign state has waived its immunity either explicitly or by implication").

Before this Court at present is Paraguay's motion to dismiss SACE's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem."), ECF No. 13-2.) Among other things, Paraguay insists that there was no valid waiver of sovereign immunity under section 1605(a)(1) of the FSIA because SACE does not, and cannot, allege that the Paraguayan official who purportedly effected an explicit waiver of Paraguay's sovereign immunity was actually authorized to do so.  (*See id*. at 25–35).[1] SACE responds that section 1605(a)(1) does not require actual authority to waive the sovereign immunity of the foreign state, and that the circumstances it alleges in the complaint are sufficient to give rise to a reasonable belief that the pertinent official had such waiver authority—i.e., that the alleged facts demonstrate there was *apparent* authority to waive sovereign immunity.  (Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 16, at 23–30.)

For the reasons explained below, this Court agrees with Paraguay that the waiver provision of the FSIA requires actual authority to waive the foreign state's sovereign immunity, which is indisputably lacking in this case.  This Court further finds that, even if apparent authority can suffice to trigger the FSIA's waiver provision, any belief that the Paraguayan official at issue here had the authority to waive Paraguay's sovereign

---

[1] Page-number citations to documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

immunity was unreasonable, given the fact the official was not a duly-accredited ambassador or otherwise vested with the power to act on Paraguay's behalf in this regard, and was also patently engaged in self-dealing when he made the waiver representations. Consequently, this Court concludes that it lacks subject-matter jurisdiction to entertain SACE's enforcement action, and as a result, Paraguay's motion to dismiss SACE's complaint must be **GRANTED**. A separate order consistent with this Memorandum Opinion will follow.

## I.  BACKGROUND

### A.  Factual Background

Unless otherwise noted, the following allegations of fact appear in SACE's complaint and the attached exhibits. (*See* Compl.; *see also* Compl. Exs. A–L, ECF Nos. 1-3 to 1-14.) In particular, the recitation below draws heavily from the two Swiss court decisions that announce the money judgments that SACE seeks to enforce in this lawsuit. (*See* J. of Civil Chamber of the Geneva Court of Justice, Sept. 3, 2004 ("2004 Swiss Judgment"), Compl. Ex. A, ECF No. 1-3; J. of the Tribunal of First Instance, Sept. 30, 2010 ("2010 Swiss Judgment"), Compl. Ex. C, ECF No. 1-5; *see also* Compl. ¶¶ 7, 11 (incorporating by reference the facts set forth in the Swiss court decisions).)

#### 1.  The Construction Projects That Paraguay Purportedly Authorized And Guaranteed

In the mid-1980s, two privately owned Paraguayan companies—Rosi SA ("Rosi") and Compania Industrial Agro-forestal Lapachos de San Isidro SA ("Lapachos")—entered into "Construction and Supply" contracts with certain Italian construction companies that agreed to undertake substantial building projects in Paraguay. (*See* 2004 Swiss Judgment at 3, 10.) Specifically, in May of 1986, Rosi

agreed to pay US $25 million for the construction of a fruit-preserve factory (*id.* at 3), and in January of 1987, Lapachos agreed to pay 50 million Deutsche Marks for a pharmaceutical plant (*id.* at 10). Before entering into its contract, Rosi apparently received a letter from Paraguay's Ministries of Finance and of Industry and Trade that indicated that the "government had deemed the establishment of the fruit preserve factory as a high priority[.]" (2004 Swiss Judgment at 4.)[2] Both contracts specifically stated that the multi-million dollar payments that Rosi and Lapachos owed would be financed over a ten-year period through either a bank loan (Rosi) or a credit contract (Lapachos) that was to be executed with specific financial institutions. (*See id.* at 3, 10.)

As part of the financing plan, a part-owner of both Rosi and Lapachos—a man by the name of Gustavo Gramont Berres ("Gramont")—became involved in the negotiation and execution of two Notes Financing Agreements ("NFAs") that Rosi and Lapachos entered into with a banking syndicate that the Overland Trust Banque ("OTB") had organized. (*Id.* at 4–5.) The NFAs were subject to Swiss law and were the primary source of the funding for the construction contracts. (*Id.* at 4, 8 (explaining that the Rosi NFA, along with subsequent addendums, covered a loan amounting to 46,700,000 SFr.); *see also id.* at 10, 13–14 (noting that the Lapachos NFA and supplemental credits financed a loan in the amount of DM 54,800,000).)[3]

---

[2] This Court was not provided with a copy of this communication.

[3] "SFr." stands for Swiss Franc. "DM" stands for Deutsche Mark, which was the official currency of Germany until that country adopted the Euro in 2002.

Furthermore, and importantly, Gramont also signed two unconditional and irrevocable "Guarantees" on behalf of the Republic of Paraguay in order to secure the loan agreements with the OTB banking syndicate.  (*See* Guaranty of the Republic of Paraguay, June 5, 1986 ("Rosi Guaranty"), Decl. of Lucio Amoruso ("Amoruso Decl.") Ex. 1, ECF No. 16-9; Guaranty of the Republic of Paraguay, Sept. 1, 1987 ("Lapachos Guaranty"), Amoruso Decl. Ex. 2, ECF No. 16-10.)  Gramont signed the Rosi guaranty on June 5, 1986, and the Lapachos guaranty on September 1, 1987.  (*See* Rosi Guaranty at 4; Lapachos Guaranty at 4; *see also* 2004 Swiss Judgment at 5, 10.)  The wording in both guarantees was substantially similar:  Gramont purported to be "duly authorized" by the "Constitution and Paraguayan law" to execute guarantees of the Rosi and Lapachos loans "in the name of the Paraguayan State[.]"  (Rosi Guaranty at 2; Lapachos Guaranty at 2.)  Thus, in essence, Gramont purported to make the country of Paraguay a guarantor with respect to the repayment of any outstanding amount that Rosi or Lapachos were obligated to pay to the OTB banking syndicate under the NFAs.  (*See* Rosi Guaranty at 2–3; Lapachos Guaranty at 2–3.)  Moreover, in each of the guaranty documents, Gramont specifically represented that "all disputes arising from the 'NFA' Agreement and the Guaranty shall be brought before the Swiss courts whose jurisdiction [Paraguay] accepts irrevocably," and that "[Paraguay] hereby expressly waives the privileges of immunity of jurisdiction and the enforcement privilege that may be granted to it[.]"  (Rosi Guaranty at 4; Lapachos Guaranty at 4.)

With the construction contracts and financing arrangements complete, OTB then contracted with SACE—an Italian agency that provides insurance for export risks—to insure the banks in the syndicate against the risk of non-repayment on the part of Rosi

and Lapachos, and the risk of nonpayment by Paraguay in its capacity as guarantor.
(*See* 2004 Swiss Judgment at 6–7, 12.)   Then, in anticipation of each of Rosi's bi-annual repayment dates, the first of which was scheduled for March 12, 1990, OTB sent letters to Rosi and to Paraguay beginning in September of 1989, "informing [them] of the amount of the principal and interest due on this due date" pursuant to Rosi's NFA.
(2010 Swiss Judgment ¶ 16.)   OTB likewise wrote Lapachos and Paraguay regarding the outstanding principal and interest owed by Lapachos on each of its bi-annual repayment dates, the first of which was scheduled for April 17, 1991.  (*See* 2004 Swiss Judgment at 16).

When the repayment dates arrived, however, both Rosi and Lapachos failed to "honor their [repayment] obligations[,]" and upon their default, "the banks contacted the Republic of Paraguay so that it would act on its obligations as guarantor."  (J. of the Tribunal of First Instance, Oct. 23, 2003, Decl. of Ana C. Reyes ("Reyes Decl.") Ex. 9, ECF No. 13-12, at 7.)  "Paraguay then informed the banks . . . on September 11, 1990, that it did not consider itself bound in any way by the commitments signed by [Gramont] (*id.*) and, in turn, SACE disputed its obligation to insure Paraguay's guarantee (*see* J. of the Swiss Federal Tribunal, Aug. 20, 1998, Reyes Decl. Ex. 11, ECF No. 13-14, at 5).  And because "the Paraguayan companies Rosi and Lapachos did not repay the loans granted, and neither the Republic of Paraguay nor SACE honored their guarantees," the banks commenced "legal proceedings before the Court of First Instance in the Canton of Geneva" against Paraguay "to obtain payment of the sums granted," and against SACE, for a declaratory judgment establishing Paraguay's

nonpayment, so that they could thereafter demand satisfaction of the debt from SACE pursuant to the insurance contract. (*Id.*; *see also* Compl. ¶ 5.)

A lengthy period of litigation ensued, involving bifurcated trial-level proceedings on jurisdictional challenges and on the merits, followed by several appeals. On September 3, 2004, the Civil Chamber of the Geneva Court of Justice (the "Court of Justice") ruled in favor of the banks with respect to their claims against Paraguay, and "order[ed] Paraguay to pay a total of 28,018,794 [Euros] and 36,700,000 SFr." (*Id.* ¶ 7.)[4]  Meanwhile, one of the banks that had participated in the loan financing but had withdrawn its legal claims in the context of the initial litigation—BNP Paribas, London Branch—"commenced a separate proceeding against Paraguay in the Swiss [courts]" on February 6, 2005. (Compl. ¶ 9.)  On September 30, 2010, the Swiss courts awarded judgment against Paraguay and in favor of BNP Paribas in the amount of 10,000,000 SFr., plus interest. (*See id.* ¶ 11; *see also* 2010 Swiss Judgment at 16.)

The banks ultimately settled their claims against SACE in November of 2009, and in the context of the settlement agreement, the banks transferred to SACE their rights to enforce all prior and potential judgments against Paraguay in connection with the Rosi and Lapachos guarantees, including the judgments that the Swiss courts rendered in 2004 and 2010. (*See* Settlement Agreements, Compl. Exs. D–L, ECF Nos. 1-6 to 1-14.)

---

[4] The Court of Justice dismissed the banks' claims against SACE (2004 Swiss Judgment at 32–33), and a Swiss appellate tribunal later "dismissed Paraguay's [final] appeal and affirmed the [Court of Justice's] judgment" on May 31, 2005. (Compl. ¶ 8; *see also* J. of the Swiss Federal Tribunal, May 31, 2005, Compl. Ex. B, ECF No. 1–4, at 13, 27.)

2.    Gramont's Title, Role, And Alleged Authority

The motion to dismiss that Paraguay has filed in the instant action relates to the status and authority of the individual who signed the Guarantees that secured the loan agreements upon which the Swiss money judgments are based. Notably, as suggested above, Gramont wore several different hats with respect to the negotiation and execution of the construction contracts and financing agreements at issue. As the president of both Rosi and Lapachos, Gramont "owned virtually all of the shares of these companies" along with his wife, who was the vice president of Rosi. (*See* J. of the Swiss Federal Tribunal, May 31, 2005, at 9.) In addition, Gramont happened to be the nephew-in-law of then-Paraguayan President Alfredo Stroessner (*see id*. at 3),[5] and when he signed the Rossi and Lapachos loan Guarantees on behalf of the Republic of Paraguay, Gramont apparently relied upon tokens of this relationship, including a presidential decree and certain documents that Paraguay's Minister of Finance had issued, as the source of his authority for doing so. (*See id*. at 4.)

Specifically, Gramont's uncle-in-law had appointed him to serve as Paraguay's "Consul" in Geneva, Switzerland, in November of 1979. (2010 Swiss Judgment ¶ 1; *see also* Judgment of the Swiss Federal Tribunal, Aug. 20, 1998, at 15–16 (noting that the Republic of Paraguay did not have an Ambassador, embassy, or diplomatic mission to Switzerland at that time).) In 1983, President Stroessner issued a decree that further conferred upon Gramont the title of "Ambassador on special mission" (2010 Swiss Judgment ¶ 2), and thereby entrusted him with "sufficient rank" to "facilitate[e] certain

---

[5] Stroessner was the President of the Republic of Paraguay from 1954 until 1989, when a military coup ousted him. (*See* 2010 Swiss Judgment ¶ 1.)

management [steps] related to development programs" for Paraguay.  (*See* Presidential

Decree No. 39.808, May 27, 1983, Amoruso Decl. Ex. 3, ECF No. 16-11, at 2; *but see*

*also* 2010 Swiss Judgment ¶ 1 (emphasizing that Gramont was "never accredited as

Ambassador . . . in Switzerland since the accreditation procedures were never

completed").)

Three years later, Paraguay's Minister of Finance, Cesar Barrientos, purportedly

clarified the scope of Gramont's official duties and powers in two documents.  First, in

a letter dated May 22, 1986, Barrientos informed any interested "national and

international institutions, organizations and individuals" that, as Ambassador on a

Special Mission based in Geneva, Gramont was endowed "with broad powers" and had

the authority "not only to promote negotiations, but to receive and sign documents and

perform operations related to the execution of programs and projects that will promote"

Paraguay's social and economic development.  (Letter from the Minister of Finance,

Amoruso Decl. Ex. 4, ECF No. 16-12, at 2.)  Second, the Ministry of Finance

promulgated an official resolution that entrusted Gramont "with the management,

presentation, and negotiation of financial transaction[s] to finance investment projects

for the socio-economic development" of Paraguay, and that also bestowed upon

Gramont a special power of attorney to "sign for the Ministry of Finance of the

Republic of Paraguay and/or its Government the necessary documentation" that such

transactions may require.  (Resolution 1205 of the Ministry of Finance, Oct. 10, 1986,

Amoruso Decl. Ex. 5, ECF No. 16-13, at 3.)  However, the resolution also specifically

clarified that, as a "Diplomatic Representative[,]" Gramont had to "maintain strict

contact and constant coordination with the Ministry" and report on all pertinent transactions. (*Id.*)

Ultimately, Paraguayan authorities apparently determined that Gramont did not carry out his assigned mission in an acceptable fashion because, on March 15, 1990, prosecutors filed a criminal complaint that accused Gramont of "utilizing invalid debt instruments to issue supposed 'guarantees' in favor of international financial institutions and backed by public credit in order to pay the private debts" of Rosi and Lapachos, and "illegal[ly] alter[ing] . . . public documents to give an air of authenticity to the supposed guarantees signed by the defendant." (Decision of Paraguayan Criminal Ct. of First Instance, Dec. 30, 1992, Reyes Decl. Ex. 5, ECF No. 13-8, at 6–7.) Gramont was convicted in 1992 in a Paraguayan Criminal Court (*see id.*), and on December 30, 1997, the Supreme Court of Paraguay sentenced him "to a prison term of seven years for use of forged documents and abuse of his public office[.]" (2010 Swiss Judgment ¶ 18.)[6] Similar criminal charges were brought in Switzerland, but Gramont was not convicted there, due in large part to the fact that he had already served the maximum penalty allowed under Swiss law when he was incarcerated in a Paraguayan prison. (*See id.* ¶ 19.)

### B.  Procedural History

As the assignee to the banks' right to enforce the 2004 and 2010 Swiss money judgments, SACE filed a complaint in this Court on July 1, 2015.  SACE's complaint

---

[6] Gramont was "cleared of the charge of fraud to the detriment of the Paraguayan State" (2010 Swiss Judgment ¶ 18), because, in the view of the Paraguayan Criminal Court of First Instance, "the government ha[d] not been induced into any . . . financial loss" because the "legal requirements for the Paraguayan Government to commit itself to this guarantee have not been met" (Decision of Paraguayan Criminal Ct. of First Instance at 11–12).

invokes the D.C. Recognition Act and requests entry of a judgment in the amount of €28,018,794 and 46,715,000 SFr. (converted to U.S. dollars at present-day rates), plus interest (calculated as of the 2010 Swiss Judgment) and post-judgment interest. (*See* Compl., Relief Requested ¶¶ A–B.)[7] The complaint briefly alludes to the history of the parties' litigation abroad, and further notes that SACE has acquired all rights to the monetary awards in the Swiss judgments pursuant to various settlement agreements. (*See id*. ¶¶ 5–13.)   SACE acknowledges that "Defendant Paraguay is a foreign state" and, as such, is ordinarily entitled to sovereign immunity (*id*. ¶ 4), but asserts that the waiver exception in 28 U.S.C. § 1605(a)(1) "is satisfied" here; therefore, this Court has subject matter jurisdiction over the complaint's claims (*id*. ¶ 1).

      1.   <u>Paraguay's Motion to Dismiss</u>

Paraguay filed a motion to dismiss SACE's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on January 21, 2016.   The motion argues that SACE has failed to carry its burden of establishing the applicability of the FSIA's waiver exception, and thus Paraguay is entitled to sovereign immunity from suit, for several reasons.

First, Paraguay argues that Gramont could only have validly waived Paraguay's sovereign immunity for FSIA purposes if he had *actual* authority to effect such a waiver, and SACE's complaint does not allege "that Gramont had actual authority—as opposed to mere apparent authority—to waive Paraguay's sovereign immunity[.]"   (*Id*. at 26; *see also id*. at 30 (explaining that "the Swiss Courts did not consider whether

---

[7] €is the symbol for the Euro, which, to date, is the official currency of 19 out of the 28 member states of the European Union.

Gramont had authority to waive Paraguay's immunity because they held that, under Swiss law, Paraguay did not have immunity for its commercial acts").  Paraguay insists that SACE's complaint is "plainly deficient" insofar as it lacks allegations of fact regarding Gramont's actual authority to waive Paraguay's sovereign immunity (*id*. at 32), and Paraguay further asserts that no such facts exist, because Gramont was not actually authorized to waive Paraguay's sovereign immunity under Paraguayan law (*see id*. at 32–35).

Paraguay also maintains that, even if the FSIA permits lawsuits against foreign sovereigns whose immunity was waived by officials with mere *apparent* authority to effect such as waiver, apparent authority was not present under the circumstances presented here, because "there was no manifestation from the principal (the Government of Paraguay) to third parties (the Banks) that Gramont had authority to waive Paraguay's sovereign immunity[,]" which the common law of agency requires in order to sustain a claim of apparent authority.  (Def.'s Mem. at 36; *see also id.* at 36–39 (citing Restatement (Third) of Agency § 3.03 (2006)); Def.'s Reply Mem. in Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 19, at 17–18.)  In this regard, Paraguay argues that none of the decrees or letters that SACE highlights "authorized Gramont to bind the Paraguayan fisc to any credit agreement, much less to one in which a company owned by Gramont himself was the primary debtor being indemnified[.]"  (Def.'s Mem. at 37.)  Moreover, Paraguay argues that apparent authority was lacking in any event because the banks plainly failed to "fulfill their [heightened] duty to investigate Gramont's authority" to bind Paraguay prior to entering into the NFAs.  (*Id*. at 36; *see also* Def.'s Reply at 13 & n.5.)

In addition to faulting the complaint's allegations regarding Gramont's authority to waive Paraguay's sovereign immunity, Paraguay's motion to dismiss also maintains that SACE should be judicially estopped from arguing that Paraguay waived its sovereign immunity, and that the FSIA's waiver exception does not apply in this case as a matter of law "[b]ecause all the acts underlying the Swiss judgments occurred outside of the United States[.]" (*See* Def.'s Mem. at 41 (asserting that it would be unfair to allow Plaintiff to "use the purported validity of the guaranties as a sword" in the present suit to support a finding of waiver when in prior proceedings in Swiss and Italian courts SACE was allowed to use "the invalidity of the guaranties as a shield"); *see also id*. at 42 ("Nothing in the plain language of the FSIA's waiver exception, § 1605(a)(1), suggests that Congress intended that exception to grant jurisdiction over extraterritorial disputes.").)

### 2.   SACE's Opposition To The Motion To Dismiss

SACE vigorously disputes that it has failed to meet its burden of demonstrating that the waiver exception to sovereign immunity is satisfied in this case. First of all, SACE rejects the contention that actual authority (which it concedes that Gramont did not have) is necessary to bind a sovereign to an explicit waiver of sovereign immunity, and argues instead that apparent authority is sufficient. (*See* Pl.'s Opp'n at 26–30 (citing *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc*., 179 F.3d 1279, 1298 (11th Cir. 1999); *Jota v. Texaco, Inc*., 157 F.3d 153, 163 (2d Cir. 1998)).  To demonstrate that Gramont had apparent authority, SACE maintains that the International Law of Consular Relations is the operative legal framework (*see* Pl.'s Opp'n at 23–26), and asserts that a duly accredited consul such as Gramont has "consular duties [that ordinarily] consist of promoting the development of commercial,

13

economic, cultural and scientific relations" (*id.* at 24 (internal quotation marks and citation omitted); is empowered to deal with foreign nations (*id.*); and "may be authorized to carry out certain diplomatic acts in countries where the sending state does not have an embassy" (*id.* (citation omitted)).  SACE emphasizes that the Swiss courts applied these international principles when they concluded that Gramont had apparent authority to execute the Guarantees, and that those same principles are equally applicable to the question of whether Gramont had apparent authority to waive Paraguay's sovereign immunity with respect to the obligation that the Guarantees established.  (*See id.* at 23–26.)

SACE also relies heavily on the Presidential Decree and the Minister of Finance's letter endorsements, which SACE says are cognizable evidence under international law and are indicative of Gramont's apparent authority to exercise valid consular powers and sign documents for development projects, such as the Rosi and Lapachos contracts and financing agreements.  (*See id.* at 25–26.)  And within the alternative framework of the common law of agency, SACE maintains, first, that the heightened "duty to investigate" that Paraguay invokes is inapposite (*id.* at 26–27); second, that if the heightened duty does apply, there would be "a potentially outcome-determinative conflict between U.S. and Swiss law[,]" such that the "relevant choice of law rules would require this Court to apply" Swiss law, because it is "the law of the jurisdiction with the 'most significant relationship to the parties and the transaction'" (*id.* at 28 (quoting Restatement (Second) of Conflict of Laws § 292 (1971))); and third, that Gramont had apparent authority to waive Paraguay's sovereign immunity under Swiss law (*id.* at 29).

As for Paraguay's claim of judicial estoppel, SACE notes that its previous position did not prevail in any of the relevant prior proceedings save one, and that it abandoned the position that the Guarantees were invalid after—and in response to—the foreign courts' final, definitive decision on the matter. (*Id.* at 31–33.) SACE further argues that the presumption against extraterritoriality does not apply to acts of Congress that merely establish jurisdiction, like the FSIA (*id.* at 34); that Congress intended the FSIA's waiver provision to be "'an exception to the normal pattern of the [FSIA], which generally requires some form of contact with the United States'" (*id.* at 35 (alteration in original) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490 n.15 (1983))); and that, in any event, an implied domestic-nexus requirement is satisfied here because "SACE has brought this action for the sole purpose of executing the judgments of the Swiss courts against Paraguay's assets in the United States." (*Id.* at 36.)

Paraguay's motion has been fully briefed and is now ripe for this Court's review. (*See* Def.'s Mem.; Pl.'s Opp'n; Def.'s Reply.)

## II.    STATUTORY FRAMEWORK AND LEGAL STANDARD

### A.    The Foreign Sovereign Immunities Act

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Co.*, 488 U.S. 428, 443 (1988). The Act "bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and [it also] . . . confers jurisdiction on district courts to hear suits . . . when a foreign state is *not* entitled to

immunity." *Id.* at 434 (emphasis in original).[8] Due to the protections that the FSIA

secures, "the foreign sovereign has 'immunity from trial and the attendant burdens of

litigation . . . not just a defense to liability on the merits.'" *Youming Jin v. Ministry of

State Sec.*, 475 F. Supp. 2d 54, 61 (D.D.C. 2007) (alteration in original) (quoting

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000)). "In

order to preserve the full scope of that immunity, the district court must make the

critical preliminary determination of its own jurisdiction as early in the litigation as

possible; to defer the question is to frustrate the significance and benefit of entitlement

to immunity from suit." *Phoenix Consulting*, 216 F.3d at 39 (internal quotation marks

and citation omitted).

"The FSIA establishes a specific framework for determining whether a sovereign

is immune from suit and consequently whether the district court has jurisdiction." *Id.*;

*see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992) ("The

[FSIA] establishes a comprehensive framework for determining whether a court in this

country, state or federal, may exercise jurisdiction over a foreign state."). In short, a

foreign state is "'presumptively immune from the jurisdiction of United States courts

unless a specific exception applies.'" *TJGEM LLC v. Republic of Ghana*, 26 F. Supp.

3d 1, 7–8 (D.D.C. 2013) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993),

*aff'd per curiam*, No. 14-7036, 2015 WL 3653187 (D.C. Cir. June 9, 2015); *see also* 28

U.S.C. §§ 1604–07 (providing that a "foreign state shall be immune from the

jurisdiction of the courts of the United States" except in the case of specific, statutorily-

---

[8] "If service of process has been made under [28 U.S.C.] § 1608, personal jurisdiction over a foreign state exists for every claim over which the court has subject matter jurisdiction[.]" *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002) (citing 28 U.S.C. § 1330(b)).

delineated exceptions). If a sovereign defendant files a motion to dismiss that invokes the shield of sovereign immunity, "the plaintiff bears the initial burden to overcome [this presumption] by producing evidence that an exception applies[.]" *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran,* 734 F.3d 1175, 1183 (D.C. Cir. 2013). Once this burden of production is met, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.*

Here, in response to Paraguay's claim of immunity, SACE raises only the "waiver" exception to sovereign immunity, 28 U.S.C. § 1605(a)(1), which, as relevant here, provides that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect[.]

*Id.* SACE asserts that both of the Guarantees explicitly waived sovereign immunity. (Pl.'s Opp'n at 16; *see also* Rosi Guaranty at 4; Lapachos Guaranty at 4.)

When addressing a foreign sovereign's explicit waiver of sovereign immunity under the FSIA, courts have been clear that "[a] foreign sovereign will not be found to have waived its immunity unless it has clearly and unambiguously done so." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002) (citation omitted). Furthermore, the waiver of sovereign immunity must have been made by someone who has, or at the very least *appears* to have, the authority to act on behalf of the foreign sovereign with respect to such a waiver. *See Doe I v. State of Israel*, 400 F. Supp. 2d 86, 104 (D.D.C. 2005) ("The Court is mindful that foreign sovereigns are legal fictions to the extent that they can only act through their individual officers."); *see also Oster v. Republic of S. Africa*, 530 F. Supp. 2d 92, 100 (D.D.C.

2007) ("Foreign sovereigns can be held liable for the actions of an individual if that individual acts in an official capacity and if that behavior fits within one of the FSIA's exceptions to immunity."), *aff'd sub nom. Oster v. Gov't of Republic of S. Africa*, 298 F. App'x 6 (D.C. Cir. 2008).[9]

When it is undisputed that the defendant qualifies as a "foreign state" that may be immune from suit under the Act (*see, e.g.,* Compl. ¶ 4 (conceding that "Defendant Paraguay is a foreign state")), "a district court must review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on [an exception]—resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion[,]" *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 141 (2d Cir. 2001) (citation omitted).

### B. Motions Under Rule 12(b)(1) In FSIA Cases

The established standard for evaluating a motion to dismiss under Rule 12(b)(1) in a case that implicates the FSIA is a nuanced one. "By moving to dismiss, the defendant may challenge either [1] the legal sufficiency" of the allegations that appear on the face of the complaint "or [2] the factual underpinning of [the] exception" upon which the plaintiff relies, or both. *Phoenix Consulting*, 216 F.3d at 40. "A facial challenge attacks 'the factual allegations of the complaint' that are contained on 'the face of the complaint,' while a factual challenge is addressed to the underlying facts

---

[9] The D.C. Circuit has yet to determine whether *actual* authority to waive sovereign immunity is required for FSIA purposes, as opposed to the mere apparent authority to execute a sovereign immunity waiver. As explained below, this Court agrees with the majority of circuit courts that have addressed the issue of a representative's authority in the context of an FSIA exception, and for the reasons laid out in Part III.A, *infra*, concludes that actual authority is required in order to satisfy the waiver exception of the FSIA.

contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C.

2003) (quoting *Loughlin v. United States*, 230 F. Supp. 2d 26, 35-36 (D.D.C. 2002)).

Notably, how the district court addresses the motion to dismiss "depends upon

whether the motion presents a [facial or a] factual challenge." *Phoenix Consulting*, 216

F.3d at 40.  When a defendant makes a facial challenge, "the court must accept as true

the allegations in the complaint and consider the factual allegations of the complaint in

the light most favorable to the non-moving party[,]" *Erby v. United States*, 424 F. Supp.

2d 180, 182 (D.D.C. 2006) (citations omitted), just as it would with respect to a motion

to dismiss brought under Rule 12(b)(6), *see Price v. Socialist People's Libyan Arab

Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) (noting that the standard for facial

challenges to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)").  To

survive such a facial challenge, the complaint's allegations, "if true, must show that the

defendant's conduct falls within the ambit of at least one of the FSIA's exceptions to

sovereign immunity." *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21

n.8 (D.D.C. 2007).

By contrast, when a defendant brings a factual challenge to the complaint, the

Court "may consider materials outside the pleadings" in order to determine whether it

has subject-matter jurisdiction over the challenged claims, *Jerome Stevens Pharms.,

Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted), just as it would

with respect to a motion to dismiss that is brought under Rule 12(b)(1).  "[T]he plaintiff

bears the burden of establishing the factual predicates of jurisdiction by a

preponderance of the evidence[,]" *Erby*, 424 F. Supp. 2d at 182 (citing *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (other citations omitted), and "[t]o the

extent that jurisdiction depends on particular factual propositions independent of the merits, the plaintiff must, on a challenge by the defendant, present adequate supporting evidence[,]" *De Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 127 (D.D.C. 2011), *rev'd in part on other grounds*, 714 F.3d 591 (D.C. Cir. 2013).  However, "[f]or purely factual matters under the FSIA . . . , this is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Id*. at 127–28 (internal quotation marks and citation omitted).

## III.   ANALYSIS

The briefs that SACE and Paraguay have filed with respect to Paraguay's motion to dismiss address both facial and factual challenges to SACE's complaint.  According to Paraguay, the primary facial deficiency is the fact that SACE's complaint contains no allegations regarding Gramont's actual authority to waive Paraguay's sovereign immunity;  Paraguay says this defect is fatal because the waiver provision of the FSIA can only be satisfied if the agent purporting to waive the immunity of the foreign sovereign actually has the authority to do so. (Def.'s Mem. at 26–30.)  In response, SACE does not contest that Gramont lacked actual authority to execute the Guarantees, along with the embedded explicit sovereign immunity waivers.  (*See* Hr'g Tr. at 46.)[10]

---

[10] SACE confirmed its position at the motion hearing during the following exchange:

> THE COURT:  Do you concede that Mr. Gramont did not have actual authority under the circumstances in this case?
> PLAINTIFF'S COUNSEL:  We are not making an argument that Mr. Gramont Berres had actual authority.

Hr'g Tr. at 46.  Thus, it appears that SACE has accepted the reality that no court—not even any of the Swiss courts—has concluded that Gramont actually had the authority to execute the Guarantees on behalf of Paraguay.  Indeed, as Paraguay notes in its brief in support of the motion to dismiss, the appellate court reviewing the 2004 Swiss Judgment found that "it was '*impossible* to assert' that

However, SACE contends that actual authority is not required for a waiver of sovereign immunity under the FSIA; instead, according to SACE, apparent authority is legally sufficient, and the record evidence in this case—specifically, the Presidential Decree of May 1983, the Minister of Finance letter of May 1986, and the Ministry of Finance resolution of October 1986—demonstrates that it was reasonable for the banks to believe that Gramont had the authority to bind Paraguay and to waive its immunity with respect to its payment obligations.  (*See* Pl.'s Opp'n at 23–30.)  Paraguay's factual challenge to SACE's complaint emerges in its response to SACE's contention that the record here demonstrates that Gramont had apparent authority to execute the Guarantees: to the contrary, says Paraguay, "[n]ot a single document referenced in the Swiss judgments indicates that Gramont had been given specific authority to waive the country's immunity[,]" and none of the alleged facts regarding the financing of construction projects and the execution of the Guarantees "would have provided the Banks with any basis to believe that Gramont had authority to waive Paraguay's immunity."  (Def.'s Mem. at 36.)

For the reasons explained fully below, this Court agrees with Paraguay that actual authority is necessary for an agent to effect a waiver of a foreign state's sovereign immunity in the context of the FSIA—a finding that resolves this case because even SACE admits that actual authority is lacking here.  Alternatively, even if the FSIA permits waiver of sovereign immunity by an agent who merely has apparent

---

Gramont had actual authority 'based on the information contained in the [trial court's] decision[.]'" (Def.'s Mem. at 30 (emphasis added; alteration in original) (quoting Swiss Federal Tribunal Judgment at 16).)  Likewise, the 2010 Swiss Judgment recognized that the "documents . . . allegedly giving Gramont authority 'later proved *not* to cover the guarantees at issue[.]'" (*Id.* (quoting 2010 Swiss Judgment at 12).)

authority, this Court finds that SACE has failed to demonstrate that Gramont had apparent authority to waive Paraguay's immunity under the circumstances presented in this case.  Accordingly, this Court concludes that it must dismiss SACE's complaint because it lacks subject-matter jurisdiction to entertain SACE's suit against Paraguay for recognition of the Swiss money Judgments.

### A.  Gramont Needed (But Admittedly Did Not Have) Actual Authority To Waive Paraguay's Sovereign Immunity For FSIA Purposes

As explained, Paraguay argues that "an agent must have *actual* authority from the foreign state—as opposed to mere[] apparent authority—to invoke an exception to the FSIA" (Def.'s Mem at 27 (emphasis in original)), while SACE contends that apparent authority is sufficient (Pl.'s Opp'n at 29–30).  Whether the FSIA demands actual or apparent authority is a question of statutory interpretation.  *See, e.g.*, *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1521 (D.C. Cir. 1984) (explaining that, when construing an exception to FSIA immunity, a court's task is "to determine what Congress meant by the language in this particular statute").  And the question is a nuanced one because the relevant provision of the FSIA only provides that "*the foreign state*" must "ha[ve] waived its immunity either explicitly or by implication," 28 U.S.C. § 1605(a)(1) (emphasis added); *see also* 28 U.S.C. § 1603(a) (defining a "foreign state" broadly to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state"), but does not specify whether an individual agent of a foreign state must have the state's *authority* to engage in an act that triggers an FSIA exception to the state's sovereign immunity, nor does it address whether an *un*authorized agent can bind the foreign state for the purpose of the FSIA's exceptions if such a person *appears* to be authorized.

22

The D.C. Circuit has yet to address the scope of the term "the foreign state" in the waiver provision of the FSIA (section 1605(a)(1)); that is, there is no binding precedent in this jurisdiction regarding whether that term includes only the agents, subdivisions, and instrumentalities that the foreign state has actually authorized to waive sovereign immunity, or whether it also includes those who merely appear to have such waiver authority. But several other circuits have specifically addressed the actual-versus-apparent authority question when interpreting similar "foreign state" language in the FSIA's "commercial activity" exception, *see* 28 U.S.C. § 1605(a)(2), and as explained below, nearly all of them have held that evidence of actual authority is necessary in order to invoke that FSIA exception.

    1.   The Prevailing Legal Analysis Of The FSIA's "Commercial Activity" Exception Is Instructive

    Like the waiver exception at issue here, the FSIA's commercial activity exception is predicated on certain conduct of "the foreign state":

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
> . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2). When interpreting this exception, courts have drawn upon the "well-settled" federal common law of derivative U.S. sovereign immunity, which holds "that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity" because they are deemed to be acting on behalf of the sovereign, and have also relied upon the corollary of that

rule: "the act of an agent *beyond* what he is legally empowered to do is *not* binding upon the government." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 399 (4th Cir. 2004) (emphasis added; internal quotation marks and citation omitted); *see also Larsen v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949) ("[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden.").

Consequently, the Fourth, Fifth and Ninth Circuits have concluded that "the commercial activity exception may be invoked against a foreign state only when its officials have actual authority." *Velasco*, 370 F.3d at 400; *see also Phaneuf v. Repub. of Indon.*, 106 F.3d 302, 307–08 (9th Cir. 1997) (holding, in a case in which "[foreign] government officers exceeded the scope of their authority in issuing and certifying the validity of [certain promissory] notes[,]" that "[i]f the foreign state has not empowered its agent to act, the agent's unauthorized act cannot be attributed to the foreign state"); *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006) ("We agree with the Fourth and Ninth Circuits that an agent's acts conducted with the apparent authority of the state is insufficient to trigger the commercial exception to FSIA."). Persuasive precedent from this district likewise supports the conclusion that actual authority is required as far as the FSIA's commercial activity exception is concerned. *See TJGEM LLC*, 26 F. Supp. 3d at 10 & nn.5–6 (rejecting the theory of apparent authority and finding that the FSIA's commercial activity exception cannot apply if the plaintiff relies on the conduct of agents who are not actually authorized); *cf. Red Lake Band of*

*Chippewa Indians v. U.S. Dep't of Interior*, 624 F. Supp. 2d 1, 19 (D.D.C. 2009) ("[C]ontracts entered into by government personnel who lack authority to bind the [United States] Government are unenforceable.").

This Court sees no reason why the term "the foreign state" as it appears in the FSIA's waiver provision should be interpreted any differently. It is "[a] standard principle of statutory construction" that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007); *see also Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("[W]e do not . . . construe statutory phrases in isolation; we read statutes as a whole." (second alteration in original) (internal quotation marks and citation omitted)). SACE has not argued that Congress intended for the term "the foreign state" to mean something different in section 1605(a)(1) (the waiver exception) than in section 1605(a)(2) (the commercial activity exception), nor would it be easy to distinguish these two FSIA exceptions in this regard, because the same rationale that supports the actual authority requirement with respect to the commercial activity of a foreign government applies to waivers, and perhaps *even more so*, given that a waiver of sovereign immunity speaks directly to the foreign sovereign's willingness to accede to the jurisdiction of another country's courts. Put another way, actual authority is especially germane when the particular act that a representative has carried out purportedly on behalf of the foreign government is of a sovereign or public nature—such as the act of waiving the government's sovereign immunity, *see Themis Capital, LLC v. Dem. Rep. Congo*, 881 F. Supp. 2d 508, 523 (S.D.N.Y. 2012) (explaining that "[a]ctions that subject foreign sovereigns to the jurisdiction and authority of the courts

of the United States, . . . such as waivers of sovereign immunity pursuant to the FSIA, are public acts")—and if an express waiver is going to serve as the basis for nullifying the presumption of sovereign immunity that the FSIA otherwise affords, it is reasonable to expect that the binding force of that foreign agent's waiver authority must be fully established.  *Cf. World Wide Minerals, Ltd.*, 296 F.3d at 1162 (requiring that a foreign state must have "clearly and unambiguously" expressed its intent to waive its sovereign immunity).

It is for this reason that the Second Circuit's contrary view of the actual-versus-apparent-authority issue is unpersuasive.  To be sure, the Second Circuit has held that mere apparent authority can suffice to bind a foreign country to an agent's commitments on behalf of the sovereign for the purpose of the FSIA's commercial activity exception. *See First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 193 (2d Cir. 1989). But that Circuit has also acknowledged that "it is possible for the persons who comprise the government to act without acting as the government[,]"  *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 537 (S.D.N.Y. 2013), *aff'd*, 768 F.3d 145 (2d Cir. 2014), and it has narrowed the holding of *First Fidelity* to "permit apparent authority to bind a sovereign engaged in *private* [commercial] conduct but to demand actual authority to bind a sovereign engaged in *public* [commercial] conduct[,]" *id*. (emphasis added); *see also Themis Capital, LLC*, 881 F. Supp. 2d at 523 (attempting to harmonize the Circuit's various decisions regarding the commercial activity exception by observing that, "where a public act by a governmental actor is at issue," courts require a showing of actual authority, but "where a private act by a government actor is at issue, courts have

consistently enforced claims of apparent authority"). Thus, it is far from clear that the Second Circuit would permit the apparent-authority standard to carry the day with respect to an agent's express waiver of sovereign immunity purportedly on behalf of the foreign state, which unquestionably qualifies as a public act.

This all means that the weight of judicial authority regarding the FSIA's commercial-activity exception holds that abrogation of sovereign immunity only occurs when the foreign state's agent has actual authority to engage in the commercial activities that give rise to this result per the statute. And because this Court discerns no meaningful difference between the "foreign state" actor that Congress references in the commercial-activity exception, *see* 28 U.S.C. § 1605(a)(2), and the "foreign state" actor who must clearly and unambiguously waive the foreign state's immunity for the purpose of the waiver exception, *id.* § 1605(a)(1), the Court does not agree with SACE's contention that apparent authority is enough to trigger the waiver exception to the presumption of immunity that the FSIA otherwise affords.

## 2. The Cases That Suggest That Apparent Authority Suffices Are Readily Distinguishable, And Requiring Actual Authority Is Consistent With Principles Of International Law

Undaunted, SACE points to the opinions of the Second and Eleventh Circuits in *Jota v. Texaco*, 157 F.3d 153 (2d Cir. 1998), and *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279 (11th Cir. 1999), which analyze the apparent-versus-actual-authority issue in the context of the FSIA's waiver exception. (*See* Pl.'s Opp'n at 30.) But these cases do not support a different result. In *Aquamar*, the Eleventh Circuit considered whether, absent extraordinary circumstances, an attempted waiver of sovereign immunity made by "a duly accredited head of a diplomatic mission (*such as an ambassador*)" in *the context of a judicial proceeding* should be deemed sufficient to

trigger the FSIA's waiver exception. *Aquamar*, 179 F.3d at 1295 (emphasis added) (footnotes omitted).  Although the diplomatic official's courtroom representations were not authorized by the foreign state, the Eleventh Circuit concluded that, in light of the internationally recognized powers of ambassadors, United States courts may reasonably rely on a foreign country's duly executed appointment of an individual to that position as a manifestation of his or her presumptive authority to waive the sovereign's immunity in judicial proceedings.  *Id*. at 1294; *see also id*. at 1295, 1296 (relying on the propositions of customary international law that "a sovereign's chief diplomatic representative to a foreign nation possesses an extraordinary role and powers" and that "an ambassador's powers include the authority to present his or her country's position before foreign tribunals"); *GDG Acquisitions LLC v. Gov't of Belize*, No. 16-12397, 2017 WL 766915, at *6 (11th Cir. Feb. 28, 2017) (holding that *Aquamar* did not apply in a case that did "not involve the acts of an ambassador").  The agent who purported to act on behalf of the foreign state in the judicial proceedings at issue in *Jota* was also an ambassador, and due to "the traditional authority of ambassadors to represent the state's position before foreign courts[,]" the Second Circuit concluded that the district court was "entitled to rely on his representations unless [it was] actually aware that he lacked such authority[.]"  *See Jota*, 157 F.3d at 163; *see also Themis Capital, LLC*, 881 F. Supp. 2d at 525 n.6 (explaining that *Aquamar* and *Jota* "found apparent authority sufficient to support . . . waivers of sovereign immunity . . . by foreign ambassadors, because of the traditional authority of ambassadors to represent the state's position before foreign courts" (internal quotation marks and citation omitted)).

Neither of these cases stands for the proposition that apparent authority is *always* sufficient to accomplish a binding waiver of sovereign immunity in any context.  Nor do their holdings extend beyond the mere proposition that an individual who has the rank of an ambassador reasonably appears to have the authority to represent the foreign sovereign's position in legal proceedings, and they certainly do not compel the conclusion that apparent authority is all that is required to bind a foreign state to an express waiver of sovereign immunity that is embedded in a financial guarantee signed by an appointed consul.  Thus, this Court agrees with Paraguay that the few cases that suggest that apparent authority may suffice to waive sovereign immunity in some circumstances are not dispositive of the outcome here.  (Def.'s Reply at 14–16.)

To the contrary, the FSIA's waiver exception plainly evinces Congress' intent to require "the foreign state" to act, and when that provision is considered in light of statute as a whole, the best reading of that term is that its encompasses only those representatives who are actually authorized to act on behalf of the state.  *See Phaneuf*, 106 F.3d at 307–08 (reasoning, based on the plain meaning of the statute, that "[i]f the foreign state has not empowered its agent to act, the agent's unauthorized act" is not "*of the foreign state*" and, thus, "cannot be attributed to the foreign state" (emphasis in original)); *see also Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 850 (D.C. Cir. 2000) (expressing "doubt . . . that a case of merely apparent authority" would suffice to attribute an agent's acts to the foreign sovereign); *cf. Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1107 (D.C. Cir. 1982) ("We have said that [an agent]'s activities . . . cannot waive [the sovereign]'s immunity if [the sovereign] did not authorize them.").  This is another way of saying

that the FSIA "unambiguously indicate[s] that only official acts, i.e., acts actually authorized by 'the foreign state,' can invoke the [waiver] exception" (Defs.' Mem. at 28), and that "if Congress had intended acts of an agent acting without actual authority to bind the foreign state under [the waiver exception], it could, and would, have so stated" (*id.* at 28–29).

Moreover, even if "the foreign state" language in the FSIA's waiver provision is deemed ambiguous, this Court must read that language narrowly and in a manner that both "avoid[s] unreasonable interference with the sovereign authority of other nations[,]" *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004), and also comports with established principles of international law.  Indeed, when Congress enacted the FSIA, it specifically intended to create "a statutory regime which incorporates standards recognized under international law[.]"  H.R. Rep. No. 94-1487, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613.  And SACE has done little to counter this Court's understanding that basic international-law principles, too, support the conclusion that apparent authority is insufficient to waive sovereign immunity.  *See, e.g.*, Hazel Fox, *The Law of State Immunity* 267 (2002) (explaining that, under principles of international law, "[t]he consent whether express or implied must be that of the State; consent to jurisdiction or waiver of immunity by a representative of the State must therefore be authorized by the State").

For all these reasons, this Court concludes that "the foreign state" as that phrase appears in 28 U.S.C. § 1605(a)(1) encompasses only agents of the foreign state who are *actually* authorized to waive sovereign immunity.  It is undisputed that Gramont did not have actual authority to act on behalf of Paraguay when he executed the Guarantees of

his company's private loans that contained purported waivers of sovereign immunity, and therefore, SACE has failed to satisfy its burden of demonstrating that the waiver exception applies in this case.  Consequently, this Court lacks subject matter jurisdiction over SACE's claims, and the case must be dismissed.

**B.    Apparent Waiver Authority Is Also Absent Under The Circumstances Presented Here**

Setting aside the requirement that an agent purporting to waive the sovereign immunity of a foreign state for FSIA purposes must have *actual* authority to do so (which resolves the instant case), it is also clear to this Court that the facts and circumstances presented in the complaint and the accompanying documents demonstrate that Gramont lacked even *apparent* authority to waive Paraguay's sovereign immunity via the Guarantees that he executed, and thus, Paraguay's factual challenge to SACE's complaint would also prevail.  "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."  Restatement (Third) of Agency § 2.03; *see also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1245 (11th Cir. 2002) ("When applying agency principles to federal statutes, 'the Restatement . . . of Agency . . . is a useful beginning point for a discussion of general agency principles.'" (second alteration in original) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 755 (1998))).  Thus, to demonstrate that Gramont possessed apparent authority to waive Paraguay's immunity, SACE would have to show (1) that Paraguay manifested as much, and (2) that the banks reasonably believed that Gramont had waiver authority in light of Paraguay's manifestation.  *See, e.g.*, *Transamerica Leasing*, 200 F.3d at 850.

In this Court's view, neither a manifestation from Paraguay nor a reasonable-belief that Gramont had the authority to waive Paraguay's sovereign immunity exists on the facts presented here. With respect to the manifestation requirement, "[a] person manifests assent or intention through written or spoken words or other conduct." Restatement (Third) of Agency § 1.03. So, for example, a principal can manifest that its representative is authorized to act on its behalf by expressly stating as much. *See id*. § 3.03 cmt. b. A principal can also manifest its intention to authorize its representative by "placing [its] agent in a defined position" with recognized duties, "or by placing [its] agent in charge of a [particular] transaction or situation" such that a third party could "naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting [otherwise]." *Id*. But, here, SACE has not pointed to a statement or act of Paraguay that manifests that country's assent to confer upon Gramont the authority to offer the public fisc as a guarantee of the loans that he was entering on behalf of his private company, much less any conduct of Paraguay that evinces its decision to permit Gramont to waive the country's sovereign immunity with respect to future litigation regarding defaulted payments with respect to those loans.

The fact that Paraguay may have authorized Gramont to represent the country in certain respects is not enough: although the Presidential decree of May 27, 1983, for example, entrusts Gramont with "facilitating certain management related to development programs for [Paraguay]" (Presidential Decree No. 39.808, at 2), SACE has not provided any proof that the Rossi and Lapachos contracts were among the particular "development programs" that Paraguayan authorities considered, and the

facts make clear that Gramont did far more than merely "facilitat[e]" the "management" of those deals.  Nor does the Presidential decree purport to establish the specific powers or duties that Paraguay was conferring upon Gramont when the President gave him the title of "Ambassador on a Special Mission"; indeed, the decree expressly states that the extent of Gramont's authority and the details of the special mission would be communicated at a later date to Gramont and to the Ministry of Foreign Affairs.  (*See id.*)  Thus, nothing expressed in this document demonstrates Paraguay's assent or intent to authorize Gramont to waive the country's sovereign immunity, in a commercial transaction or otherwise.

The statements of the Minister of Finance issued on May 22, 1986, and October 10, 1986 likewise fall short of manifesting Paraguay's assent to Gramont's power to execute the Guarantees and waive Paraguay's immunity with respect to those obligations.  (*See* Pl.'s Opp'n at 11–12, 25–26.)  In referencing Gramont's authority, the May 22nd letter refers solely to his ability to negotiate and sign documents in connection with "the execution of [development] programs and projects" (Letter from the Minister of Finance at 2), and the subsequent resolution, dated October 10, 1986, confers only the power to "manage, present and negotiate proposals," and to sign "necessary documentation" for certain financial transactions (Resolution 1205 of the Ministry of Finance at 2, 3).  Thus, neither of these documents evinces Paraguay's delegation of the authority to waive immunity with respect to a contract or proposal, and neither document comes anywhere close to suggesting that Gramont was vested with the authority to act independently or without prior approval of the sovereign itself.  To the contrary, by demanding "strict contact and constant coordination with the

Ministry of Finance," as well as ongoing reports to the finance agency, the resolution expressly *limited* Gramont's power.  (Resolution 1205 of the Ministry of Finance at 3). Thus, the Swiss courts rightly characterized these documents as a special power of attorney (2004 Swiss Judgment at 8), which, by their nature, conveyed only the authority to enter into transactions as specifically authorized and assented to by the principal.  *Cf*. Restatement (Second) of Agency § 3 (1958) ("A special agent is an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service.").

It is also notable that Gramont lacked the recognized title of duly accredited "Ambassador"—he was only an accredited "Consul"—and the fact that a consul has limited powers to act on behalf of its sovereign is a well-established principle of international law.  *See* Constantin Economides, *Consuls*, in 9 Max Planck Inst. For Comparative Pub. Law & Int'l Law, *Encyclopedia of Pub. Int'l Law* 40 (Rudolf Bernhardt ed., 1986) (explaining that "[t]he usual criterion used for the distinction between diplomats and consuls" is the differing scope of their "representative character" *vis-à-vis* the sending State; unlike an ambassador, a consul's authority is "specific" to "matters within their competence" and "secondary to that of diplomatic agents"); *see also The Anne*, 16 U.S. 435, 445 (1818) ("A consul, though a public agent, is supposed to be clothed with authority *only for commercial purposes*.  He . . . is not considered as a minister, of diplomatic agent of his sovereign, intrusted, by virtue of his office, with authority to represent him in his negotiations with foreign states, or to vindicate his prerogatives." (emphasis added)).  That is, while ambassadors are "diplomatic officer[s]" who broadly "represent the sovereign" inside the receiving state,

*see* Black's Law Dictionary (10th ed. 2014) (defining an "ambassador"), consuls are mere "commercial agents of a government" who are "charged with the duty of promoting the commercial interests of the state," but are "*not* diplomatic agents," *id.* (defining "consul" (emphasis added; internal quotation marks and citation omitted); *see also Hourani v. Mirtchev*, 796 F.3d 1, 13 (D.C. Cir. 2015) (emphasizing that "the Ambassador is not just any government functionary, but instead is an official whose defining purpose is to speak for" and "[r]epresent the sending State . . . in the receiving State" (first alteration in original) (internal quotation marks and citation omitted)).

Therefore, courts have long held that a consul "is not competent, merely by virtue of his office, to appear [before our courts] for his government and claim immunity[,]" *The Sao Vicente*, 260 U.S. 151, 154 (1922), or, by extension, to waive it, *see* Fox, *The Law of State Immunity* at 185 (noting that in U.S. courts, a plea of immunity or waiver "asserted through . . . a consul . . . would not be entertained"); *see also* James J. Hogan, *International Law--Sovereign Immunity*, 15 U. Miami L. Rev. 450, 452 (1961) ("The authorized representative of a foreign state is the only competent person to appear and raise the jurisdictional issue. Representations by a Consul General . . . or are ineffectual.").[11]

---

[11] SACE suggests that the fact that there was no an accredited Paraguayan ambassador in Switzerland at the time that Gramont served as Consul should factor into the apparent authority analysis, because Paraguay might have intended for Gramont to have the power to engage in certain diplomatic acts. (*See* Pl.'s Opp'n at 24–26.) But a foreign consul can take on ambassadorial responsibilities *only* when the receiving State has previously consented to and authorized such performance. *See* Vienna Convention on Consular Relations and Optional Protocol on Disputes, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820; *see also The Sao Vicente*, 260 U.S. at 154–55 (explaining that a consul's duties are commercial and while they may be broadened by special authority to encompass diplomatic acts, such enlargement must "be recognized by the government within whose dominions [the consul] assumes to exercise [diplomatic authority]" in order to be effective (internal quotation marks and citation omitted)); *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 203 (S.D.N.Y. 1929) ("A foreign sovereign cannot authorize his agents . . . to perform any sovereign or governmental functions within the domain of another sovereign, without his consent."). And SACE has not provided any evidence that Switzerland consented to Gramont's alleged exercise of diplomatic authority. *Cf. The Anne*, 16 U.S. at

The final blow to any contention that apparent authority existed—i.e., that the banks reasonably concluded that Gramont was authorized to waive Paraguay's sovereign immunity with respect to the financial obligations the Guarantees secured—is the fact that the Guarantees themselves, which Gramont negotiated and signed, were plainly part of a self-interested financial transaction that benefitted Gramont personally due to his role as a principal shareholder of both Rosi and Lapachos.  This circumstance was sufficient to put the banks on notice that Gramont's authority to enter binding Guarantees on behalf of Paraguay was questionable.  As mentioned above, a belief that the principal has authorized its agent to act can be rendered *un*reasonable in the presence of "facts suggesting that this may not be so[,]" Restatement (Third) of Agency § 3.03 cmt. b, and self-dealing has long been considered a fact of consequence in this regard.  *Cf. Aquamar*, 179 F.3d at 1299 (declining to doubt an ambassador's presumptive authority to bind a foreign sovereign to a waiver, where the ambassador had merely filed a court document on behalf of the sovereign, which the court considered to be "the type of task a diplomat traditionally performs on behalf of his nation, rather than a commercial transaction that [the ambassador] might have entered for his own purposes").  In other words, it is a well-established agency law principle that, "[i]n a transactional context, the agent's position as a fiduciary should prompt doubt in the mind of the reasonable third party when the agent appears to be using

---

446 (concluding that the consul general was "incompetent" to assert legal defenses on behalf of the sovereign where "[t]here [was] no suggestion, or proof, of any such delegation of [diplomatic] authority" recognized by the receiving State).

authority to bind the principal to a transaction that will not benefit the principal" and benefits the agent instead. *Id*. § 2.03 cmt. d.

Here, the record demonstrates that the banks knew, or should have known, about Gramont's ownership stake in the private companies that benefitted from the Guarantees he purported to sign on Paraguay's behalf. Gramont's wife was the signatory for Rosi's NFA (Rosi NFA, ECF No. 16-16, at 14), which, in and of itself, should have alerted the banks to Gramont's improper personal stake in the transaction. What is more, the Guarantees had no apparent, direct benefit for the government of Paraguay or any state-owned enterprise, and the signing of such Guarantees for the benefit a private company was unprecedented in Paraguayan history. (*See* Decision of Paraguayan Criminal Court of First Instance, Dec. 30, 1992, at 9; *see also* Restatement (Third) of Agency § 2.03 cmt. d (noting that a transaction that is unprecedented in the principal's history "should strike a dissonant chord for a reasonable third party"). The fact that Gramont also purported to execute the Guarantees by affixing the seal of a Paraguayan embassy that did not exist (*see* Decision of Paraguayan Criminal Court of First Instance at 16–17) was another clear red flag that should have alerted the banks to the potential that Gramont's conduct was unauthorized. And when all of these questionable aspects of the Gramont's self-interested activity with respect to signing the Guarantees are taken into account, this Court has little doubt that these facts render the banks' blind reliance on Gramont's purported authority to waive Paraguay's sovereign immunity manifestly unreasonable. *See* Restatement (Third) of Agency § 2.03 cmt. d (explaining that, where the principal will not gain an economic advantage from a transaction, "the relevant questions for a third party who interacts with the agent are

whether it is reasonable to believe that the principal has authorized, consented to, or acquiesced in the agent's actions and whether the scope of the principal's consent encompasses the agent's conduct").

The bottom line is this: even "an ambassador's actions under color of authority do not, as a matter of law, automatically bind the state that he represents[,]" *First Fidelity*, 877 F.2d at 193, and, thus, "[t]he facts of a given case must be [carefully] examined[,]" *id.* After carefully viewing the facts of this case, this Court finds that the vaguely worded statements of the President and Minister of Finance did not give rise to a reasonable belief that Paraguay intended to cloak Gramont with unlimited authority to act on its behalf, or, more to the point, to waive its sovereign immunity with respect to any and all commercial transactions. And if such a belief did arise, the facts regarding Gramont's personal interest in the transactions that the Guarantees purportedly secured completely undermined its reasonableness. Consequently, even if the FSIA's waiver exception encompasses waivers executed by officials with mere apparent authority, this Court finds that SACE has failed to demonstrate that Paraguay waived its immunity for the purpose of the FSIA under the circumstances presented here.

## IV.    CONCLUSION

SACE has brought the instant action in order to enforce two substantial money judgments that the Swiss courts have issued against the Republic of Paraguay. Although there is no dispute that the Swiss tribunals are competent to adjudicate the issues before them and are thus entitled to respect (*see* Pl.'s Opp'n at 21–23), the question before *this* Court is the extent of its own jurisdiction to entertain SACE's

action under federal law, and the Court has a duty to make its own independent factual determinations in order to ascertain its authority under the FSIA.

Having undertaken to fulfill that duty, this Court has concluded, first and foremost, that the FSIA permits waivers of sovereign immunity by a foreign state's agent only if the agent has actual authority, which Gramont admittedly did not possess with respect to the express waiver of sovereign immunity at issue in this case. On this basis alone, SACE has failed to meet its initial burden of showing that an exception to the Act's immunity applies. But there is more: based on the facts alleged in the complaint and the record evidence presented to this Court, the Court further finds that SACE has failed to show that Paraguay manifested its assent to Gramont's exercise of authority in relation to the Guarantees such that the banks had a reasonable belief that Gramont had the power to execute the Guarantees on behalf of Paraguay and to waive Paraguay's immunity from suit. Thus, Paraguay's presumptive sovereign immunity under the FSIA stands unscathed as a matter of law and fact, and that immunity renders this Court without subject-matter jurisdiction to entertain the present action. Accordingly, and as set forth in the accompanying Order, Paraguay's motion to dismiss SACE's complaint must be **GRANTED**.


DATE: March 21, 2017                    *Ketanji Brown Jackson*
                                        KETANJI BROWN JACKSON
                                        United States District Judge